**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 25-cv-2205-WJM-STV

DENNIS AROSTEGUI-MALDONADO

      Petitioner,

v.

JUAN BALTAZAR, in his official capacity as warden
of the Aurora Contract Detention Facility, *et al*.

      Respondents.

---

**ORDER GRANTING IN PART AND DENYING IN PART
PETITIONER'S CONSTRUED MOTION FOR PRELIMINARY INJUNCTION**

---

      Before the Court is Petitioner Dennis Arostegui-Maldonado's ("Maldonado")

Construed Motion for Preliminary Injunction (the "Motion").  (ECF Nos. 5, 17.)  At the

Court's direction, the parties separately briefed Maldonado's request for a preliminary

injunction (1) compelling Respondents to immediately release him from detention or, in

the alternative, to bring him before an immigration judge ("IJ") for a constitutionally

adequate bond hearing; and (2) prohibiting his unlawful removal from the United States

or his transfer to a facility outside of the District of Colorado.  (ECF Nos. 24, 26, 27, 31.)

The Court held an evidentiary hearing on the Motion on August 1, 2025.  (ECF No. 40.)

The Motion is now ripe for adjudication.

      For the reasons set forth below, the Motion is granted in part and denied in part.

# I. BACKGROUND[1]

## A.    Factual Background

### 1.    June 2008 Removal Order

Maldonado is a native and citizen of Costa Rica and a dual citizen of El Salvador.

(ECF No. 34 at ¶¶ 2–3.)  He first entered the United States without inspection in 2007.

(*Id.* at ¶ 4.)  The following year, the U.S. Department of Homeland Security ("DHS")

initiated immigration court proceedings against him, and an IJ ordered him removed to

Costa Rica in June 2008.  (*Id.* at ¶¶ 5–7.)

Maldonado entered the United States without inspection a second time in 2013.

(*Id.* at ¶ 8.)  In 2018, Immigration and Customs Enforcement officers ("ICE")

encountered him, determined that he had illegally reentered the country, and reinstated

the June 2008 order of removal pursuant to 8 U.S.C. § 1231(a)(5).  (*Id.* at ¶¶ 9–10.)

After Maldonado claimed a fear of returning to Costa Rica and El Salvador, ICE referred

him to U.S. Citizenship and Immigration Services ("USCIS") for a reasonable fear

interview with an asylum officer.  (*Id.* at ¶ 11.)  At that time, USCIS determined that

Maldonado had not established a reasonable fear of future persecution, and an IJ

affirmed.  (*Id.* at ¶¶ 12–13.)  Thus, in October 2018, DHS again removed Maldonado to

Costa Rica.  (*Id.* at ¶¶ 13–14.)

### 2.    September 2021 Reinstated Removal Order

Maldonado claims that, in or around December 2020, after returning to Costa

Rica, he was severely beaten and raped by three Costa Rican police officers who

---

[1] The Background is drawn substantially from the parties' Stipulations of Fact submitted in advance of the August 1 evidentiary hearing and, where appropriate, the parties' briefs on the Motion.  (ECF Nos. 5, 24, 26, 27, 31, 34.)

demanded that Maldonado sell drugs on their behalf and threatened to kill him if he did
not comply.  (ECF No. 5 at 4.)  He fled Costa Rica as a result.  (*Id.*)  In early September
2021, Maldonado entered the United States a third time through California, again
expressing a fear of returning to Costa Rica.  (ECF No. 5 at 4; ECF No. 34 at ¶ 15.)

DHS took Maldonado into custody pursuant to its detention authority under 8
U.S.C. § 1231(a)(6) and, on September 10, 2021, ICE reinstated the prior removal
order.  (ECF No. 34 at ¶¶ 15, 18.)  Shortly thereafter, DHS transferred Maldonado to the
Aurora Contract Detention Facility ("Aurora Facility") and referred him to USCIS for
another reasonable fear interview.  (*Id.* at ¶¶ 19–20.)  This time, USCIS determined that
Maldonado *had* established a reasonable fear of persecution or torture.  (*Id.* at ¶ 21.)  It
referred Maldonado to an IJ for full consideration of his request for withholding of
removal in October 2021.  (*Id.* at ¶ 22.)

At a hearing before the IJ in January 2022, Maldonado testified about the
physical violence and threats he endured at the hands of the Costa Rican police.  (*Id.* at
¶ 23.)  The IJ found Maldonado's testimony credible.  (*Id.* at ¶ 24.)  Nevertheless, the IJ
denied his requests for withholding of removal to Costa Rica and El Salvador under
§ 241(b)(3) of the Immigration and Nationality Act ("INA") and the Convention Against
Torture ("CAT").  (*Id.* at ¶ 25.)  Maldonado appealed the IJ's decision and, roughly five
months later, the Board of Immigration Appeals ("BIA") affirmed the adverse finding.
(*Id.* at ¶¶ 26–27.)  Maldonado petitioned the Tenth Circuit for review of the BIA's
decision in August 2022.  (*Id.* at ¶ 28.)  However, he did not request a stay of removal
during the pendency of his proceedings before the Tenth Circuit, and on September 29,
2022, ICE removed him to Costa Rica.  (*Id.* at ¶¶ 29–30.)

Maldonado was continuously detained from the time he entered the United States in September 2021 until his removal in September 2022. (*Id.* at ¶ 30.)

    3.   <u>Tenth Circuit's Remand</u>

Maldonado claims that, upon his arrival in Costa Rica, his former landlord warned him that the same police officers who had previously beaten him had come to her house looking for him and had a warrant for his arrest. (ECF No. 5 at 5.) According to Maldonado, she also told him "she knew of two other men who were killed by those police officers for not selling drugs for them." (*Id.*) Maldonado fled to El Salvador the next day. (*Id.*)

When Maldonado reached the Salvadoran checkpoint, however, he faced still more violence. (*Id.* at 6.) Maldonado avers that, after noting he was traveling with a transit document issued by DHS indicating he had been deported from the United States, four officers at the checkpoint accused him of being a gang member, beat him, branded him with a piece of rebar in the fire of a nearby tortilla vendor, and threatened to kill him if he ever returned to El Salvador. (*Id.*) Maldonado estimates that he was in El Salvador for a total of four hours. (*Id.*)

Meanwhile, however, on August 1, 2023, the Tenth Circuit issued a published decision granting Maldonado's petition for review in part and remanded the case to the BIA for reconsideration of his CAT claim under the correct color-of-law standard. (ECF No. 34 at ¶ 31.) *See Arostegui-Maldonado v. Garland,* 75 F.4th 1132 (10th Cir. 2023), *abrogated in part by Riley v. Bondi,* 606 U.S. ----, 145 S. Ct. 2190 (2025). The BIA in turn remanded Maldonado's case to an IJ for further fact finding as appropriate. (ECF No. 34 at ¶ 32.)

In December 2024, DHS permitted Maldonado to return to the United States to

pursue his remanded proceedings before the IJ.  (*Id.* at ¶ 33.)  ICE took him into custody immediately upon his arrival.  (*Id.*)

At a hearing before the IJ in May 2025, Maldonado testified about the warnings he had received from his landlord upon his return to Costa Rica and the violence and threats he experienced by Salvadoran police when he attempted to flee.  (*Id.* at ¶¶ 35–37.)  The IJ again found Maldonado's testimony credible and granted his application for withholding-only relief to Costa Rica and El Salvador under CAT.  (*Id.* at ¶¶ 38–39.)

DHS appealed this decision by the IJ.  (*Id.* at ¶ 40.)  Maldonado cross-appealed the IJ's denial of withholding-only relief under INA § 241(b)(3) as to El Salvador.  (*Id.* at ¶ 41.)  These appeals remain pending before the BIA.

Maldonado has remained in detention at the Aurora Facility since he was permitted to reenter the country in December 2024.  (*Id.* at ¶ 34.)

### 4.    Habeas Proceedings

Maldonado's counsel avers that, around mid-morning on July 18, 2025, they received a communication from Maldonado's daughter alerting them that ICE intended to imminently transfer Maldonado out of the Aurora Facility.  (ECF No. 5 at 3; ECF No. 27 at 1.)  Maldonado's counsel swiftly filed a petition for writ of habeas corpus pursuant to 22 U.S.C. § 2241 (the "Petition").  (ECF No. 1.)  Around 12:30 p.m. on the same day, ICE's Enforcement and Removal Operations Denver Field Office ("Denver ERO") received an e-mail from Maldonado's counsel requesting that he not be transferred out of the District of Colorado due to a pending habeas petition.  (ECF No. 34 at ¶ 42.)  Roughly 45 minutes later, an ICE officer advised that he would not be transferred.  (*Id.* at ¶ 43.)

Later that evening, Maldonado's counsel filed a Motion for Temporary

Restraining Order ("TRO"), asking the Court "to award injunctive relief compelling Respondents to grant his immediate release, or to afford him a constitutionally adequate bond hearing" and "[i]n the alternative, . . . a temporary restraining order prohibiting Respondents from transferring him outside this Court's jurisdiction during the pendency of the underlying habeas action . . . ."  (ECF No. 5 at 2.)  His counsel asserted that, although ICE had halted the process of transferring Maldonado that afternoon, it did not provide any assurance that he would *never* be transferred.  (*Id.* at 3.)

On July 21, the Court granted the Motion for TRO in part and restrained Maldonado's transfer out of the District of Colorado and his removal from the United States, to expire on August 4, 2025 at 11:59 p.m.  (ECF No. 17.)  By the same Order, the Court construed the Motion for TRO to further seek a preliminary injunction and set an evidentiary hearing on the Motion for August 1, 2025.  (*Id.*)

In their subsequent briefing on the Motion, Respondents assert that, on July 18, the Aurora Facility was at or near full detention capacity.  (ECF No. 26 at 5.)  Thus, to make space for detainees with active immigration court hearings at the Aurora immigration court, Denver ERO attempted to transfer a number of detainees with inactive immigration cases to the Natrona County Jail in Casper, Wyoming, including Maldonado.  (*Id.*)  Respondents also disclosed that, on July 24, ICE conducted a post-order custody review pursuant to 8 C.F.R. § 241.4 to determine whether to continue Maldonado's detention, for the first time since Maldonado had been re-detained in December 2024.  (ECF No. 24 at 4; ECF No. 34 at ¶ 45.)  ICE concluded that Maldonado was a public safety concern because he "has been arrested several times in San Salvador, El Salvador," although "[t]he dispositions of those cases are unknown."

(*Id*.)  ICE also concluded that Maldonado was a flight risk because he had been

removed from the United States on three prior occasions.  (*Id*.)

At the August 1 evidentiary hearing, the Court heard testimony from Maldonado

and Dr. Laura Ramzy, a clinical psychologist who has conducted a psychological

evaluation of Maldonado, in support of his request for preliminary injunctive relief.  (Aug.

1, 2025 Hearing Transcript [hereinafter "Tr."] at 45:12–48:9.)[2]  The Court found

Maldonado's uncontroverted testimony to be particularly articulate, credible, internally

consistent, and poignant.  Dr. Ramzy's thoughtfully precise fact and expert opinion

testimony was well-reasoned, and more than amply supported by her knowledge of the

factual record generally, and Maldonado's individualized mental and physical health

conditions specifically.

The Court also heard testimony from Deportation Officer Irma Quinones on

behalf of Respondents.  In stark contrast to the testimony of Petitioner's witnesses, the

Court found Quinones's testimony to be equivocal, uninformed, and unhelpful.  Indeed,

the Court found Quinones's testimony on many key factual matters to be extraordinarily

deficient.  By way of example only, she repeatedly was unable—on both direct and

cross examination—to answer basic questions about the reasons for Maldonado's

continued confinement, not to mention his future prospects for a change in this status.

After the hearing, the Court *sua sponte* extended the TRO to 11:59 p.m. on

August 8, 2025 pending its decision on the Motion.  (ECF No. 43.)

At least as of the August 1 hearing, Maldonado remains housed at the Aurora

---

[2] In this Order, quotations from the evidentiary hearing are taken from the rough draft of
the transcript prepared by the Court Reporter; the transcript is subject to revision before it is
finalized by the Court Reporter.

Facility.  (ECF No. 34 at ¶ 48.)  In support of his release, Maldonado proffers that his

brother, who lawfully resides in Virginia, has committed to being Maldonado's sponsor

and will provide him with a stable residence and ensure that he appears in court when

required.  (*Id.* at ¶ 47.)  The Court understands that Maldonado has a second brother

who lives in Virginia and that each of Maldonado's three children also lawfully reside in

the United States.  (*Id.* at ¶ 1.)  Moreover, although ICE contends that Maldonado has

been arrested in El Salvador, it is not aware of Maldonado ever being accused or

convicted of a criminal offense in the United States.  (*Id.* at ¶ 46.)

## II. LEGAL STANDARD

"A preliminary injunction requested under Rule 65(a) is an extraordinary remedy

that may only be awarded upon a clear showing that the [movant] is entitled to such

relief."  *Rocky Mountain Gun Owners v. Polis,* 121 F.4th 96, 112 (10th Cir. 2024)

(internal citation and quotation marks omitted); *see also Dominion Video Satellite, Inc. v.*

*Echostar Satellite Corp.,* 356 F.3d 1256, 1261 (10th Cir. 2004) ("the [movant's] right to

relief must be clear and unequivocal" (internal citation omitted)).  The movant must

show:

> (1) a substantial likelihood of success on the merits of their
> suit; (2) that they are likely to suffer irreparable harm in the
> absence of preliminary relief; (3) this threatened harm
> outweighs the harm a preliminary injunction may pose to the
> opposing party; and (4) if issued, the injunction will not
> adversely affect the public interest.

*Rocky Mountain Gun Owners,* 121 F.4th at 112.  The likelihood-of-success and

irreparable-harm factors are "the most critical" in the analysis.  *Id.* (internal citation

omitted).  And the third and fourth factors "merge" where, like here, the Government is

the opposing party.  *Id.* (internal citation omitted).

Moreover, where a party seeks a "disfavored" preliminary injunction, as is partly the case here, the Tenth Circuit requires more. *Free the Nipple—Fort Collins v. City of Fort Collins, Colorado,* 916 F.3d 792, 797 (10th Cir. 2019). "Disfavored preliminary injunctions don't merely preserve the parties' relative positions pending trial." *Id.* Rather, "a disfavored injunction[s] may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." *Id.* "To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: [H]e must make a 'strong showing' that these tilt in h[is] favor." *Id.*

### III. ANALYSIS

**A.    Immediate Release**

Maldonado's foremost request is for a preliminary injunction compelling Respondents to immediately release him from detention. His request for such an injunction, however, fails at the first factor. Maldonado has not satisfied his heightened burden to show a substantial likelihood of success on the merits of his Fifth Amendment claim of unlawful detention. (ECF No. 1 at ¶¶ 73–75.) *See Free the Nipple—Fort Collins,* 916 F.3d at 798 ("The heightened standard applicable to disfavored preliminary injunctions requires the Plaintiffs to make a strong showing that their equal-protection claim is substantially likely to succeed on the merits.").

Maldonado contends that his continued "detention violates *Zadvydas* and 8 U.S.C. § 1231(a)(6) [since] there is not a substantial likelihood DHS will be able to carry out his removal in the reasonably foreseeable future." (ECF No. 5 at 15.) In *Zadvydas,* the Supreme Court considered the claims of two noncitizens challenging their continued

detention under § 1231(a)(6).  *Zadvydas v. Davis,* 533 U.S. 678, 683–86 (2001).  Both

filed petitions for writs of habeas corpus pursuant to § 2241 after the Government failed

to effectuate their removal to their respective home countries or elsewhere.  *Id.* at 684–

86.  In this way, "[t]he civil confinement . . . at issue [in *Zadvydas* was] not limited, but

potentially permanent."  *Id.* at 691.  The Supreme Court held that § 1231(a)(6), "read in

light of the Constitution's demands, . . . does not permit indefinite detention."  *Id.* at 689.

Rather, it "limits an alien's post-removal-period detention to a period reasonably

necessary to bring about that alien's removal from the United States."  *Id.*  The Court

recognized a six-month period of detention as presumptively reasonable.  *Id.* at 701.

But, "after this 6-month period, once the alien provides good reason to believe that there

is no significant likelihood of removal in the reasonably foreseeable future, the

Government must respond with evidence sufficient to rebut that showing."  *Id.* at 701.

Maldonado argues that, in light of the remanded proceedings on his CAT claim

and ongoing appeals of the IJ's decision granting him relief, DHS cannot effectuate his

removal in the reasonably foreseeable future and his continued detention thus violates

*Zadvydas.*  (ECF No. 27 at 1.)  Maldonado submits that the average processing time for

BIA appeals is over six months.  (ECF No. 5 at 17.)  And if the BIA remands the case to

the IJ, it will take several more months to receive a new hearing, after which there may

be an appeal to the Tenth Circuit.  (*Id.*)

Maldonado is right that no one can predict the date on which his claims for

withholding-of-removal will come to a definitive end.  But end they must.  And controlling

precedent strongly supports that this alone is enough to bring Maldonado's detention

outside the auspices of *Zadvydas*—no matter how dubious the merits of the

Government's appeal may appear. *Soberanes v. Comfort,* 388 F.3d 1305, 1311 (10th
Cir. 2004) (affirming denial of habeas relief where petitioner's continued detention was
"directly associated with a judicial review process that has a definite and evidently
impending termination point" and thus was "clearly neither indefinite nor potentially
permanent like the detention held improper in *Zadvydas*"); *see also Zadvydas,* 533 U.S.
at 689 (The "6-month presumption . . . does not mean that every alien not removed
must be released after six months. To the contrary, an alien may be held in
confinement until it has been determined that there is no significant likelihood of
removal in the reasonably foreseeable future."). At a minimum, this precedent is
enough to cast some doubt on Maldonado's likelihood of success on the merits of his
claim for unlawful detention in violation of the Fifth Amendment.

Since Maldonado's request for a mandatory preliminary injunction compelling his
immediate release fails at the first factor, the Court need not analyze the remaining
preliminary injunction factors. The Motion is therefore denied insofar as Maldonado
asks to be immediately released from detention.

**B.    Bond Hearing**

Alternatively, Maldonado seeks a preliminary injunction compelling Respondents
to bring him before an IJ for a constitutionally adequate bond hearing. The Court grants
this request.

1.    Likelihood of Success on the Merits

Maldonado contends he is likely to succeed on the merits of his claim that his
prolonged detention without a constitutionally adequate bond hearing violates the Fifth
Amendment's Due Process Clause. (*See* ECF No. 1 at ¶¶ 76–80.) Maldonado is right.

As a threshold matter, the parties disagree as to the standard the Court should

apply in analyzing Maldonado's claim that his detention has become unconstitutionally

prolonged.  Maldonado argues the Court should apply the six-factor test first adopted in

this District in *Singh v. Choate,* 2019 WL 3943960 (D. Colo. Aug. 21, 2019) (Mix, M.J.).

Respondents counter that *Zadvydas* provides the exclusive standard for due process

challenges to *post*-removal detention orders under § 1231, and they thus urge that the

Court "should not apply the six-factor test to assess Petitioner's due-process challenge .

. . ."  (ECF No. 24 at 10–12.)

The Court finds the recent *Johnson v. Arteaga-Martinez* decision informative on

this issue.  596 U.S. 573 (2022).  There, the Supreme Court explained that *Zadvydas*

involved a *statutory* interpretation of § 1231(a)(6).  *Id.* at 579 ("The [*Zadvydas*] Court

applied the canon of constitutional avoidance and determined that 'read in light of the

Constitution's demands,' § 1231(a)(6) 'does not permit indefinite detention' . . . ."

(quoting 533 U.S. at 689)).  And indeed, the Supreme Court further concluded in

*Arteaga-Martinez* that the plain language of § 1231(a)(6) does not support a claim that

the *statute* "requires bond hearings before immigration judges after six months of

detention" either.  596 U.S. at 580–81.

However, the Supreme Court expressly did not reach the petitioner's

*constitutional* claim that due process requires individualized bond hearings when

detention under § 1231(a)(6) becomes prolonged.  *Id.* at 583.  Thus, *Arteaga-Martinez*

implicitly recognized that as-applied constitutional challenges to prolonged detention are

separate and distinct from the statutory prohibition against indefinite detention

embodied in *Zadvydas.*  In this District, the vast majority of judges have applied the

*Singh* factors when assessing a noncitizen petitioner's *constitutional* challenge to

prolonged detention without a bond hearing.  *E.g., Martinez v. Ceja,* 760 F. Supp. 3d 1188, 1193 (D. Colo. 2024); *de Zarate v. Choate,* 2023 WL 2574370, at *3 (D. Colo. Mar. 20, 2023); *Daley v. Choate,* 2023 WL 2336052, at *3 (D. Colo. Jan. 6, 2023); *Viruel Arias v. Choate,* 2022 WL 4467245, at *2 (D. Colo. Sept. 26, 2022); *Singh v. Choate,* 2022 WL 17075894, at *3 (D. Colo. July 27, 2022); *Singh v. Garland,* 2021 WL 2290712, at *4 (D. Colo. June 4, 2021); *Villaescua-Rios v. Choate,* 2021 WL 269766, at *2 (D. Colo. Jan. 27, 2021).

Still, it is true that the *Singh* factors were first adopted in a case analyzing whether a noncitizen petitioner's prolonged detention *under § 1226* without a bond hearing violated due process—*i.e.*, where the petitioner was detained "pending a decision on whether the alien is to be removed from the United States."  2019 WL 3943960, at *3; 8 U.S.C. § 1226(a).  That is unlike here, where Maldonado is detained under § 1231, the statute governing post-removal order detention.  Nevertheless, judges in this District have also more recently applied the *Singh* factors in assessing whether a petitioner's detention under § 1231 has become unreasonably prolonged without a bond hearing.  Indeed, in *Juarez v. Choate,* U.S. District Judge Charlotte N. Sweeney—responding to a similar argument advanced by the respondents in that case—concluded there was "little substantial distinction between the liberty interest of noncitizens detained pursuant to § 1226(c) and § 1231(a)(6), because '[r]egardless of the stage of the proceedings, the same important interest is at stake—freedom from prolonged detention.'"  2024 WL 1012912, at *6 (D. Colo. Mar. 8, 2024) (quoting *Guerrero-Sanchez v. Warden York County Prison,* 905 F.3d 208, 222 (3d Cir. 2018), *abrogated in part by Arteaga-Martinez,* 596 U.S. 573)).  U.S. District Judge Regina M.

Rodriguez recently followed suit. *Ramirez v. Bondi,* 2025 WL 1294919, at *6 (D. Colo.

May 5, 2025) (adopting reasoning of *Juarez*).[3]  This Court will do the same.

The Court thus proceeds to consider whether Maldonado is likely to succeed on

the merits of his Fifth Amendment claim in view of the following factors:

> (1) the total length of detention to date; (2) the likely duration
> of future detention; (3) the conditions of detention; (4) delays
> in the removal proceedings caused by the detainee; (5)
> delays in the removal proceedings caused by the
> government; and (6) the likelihood that the removal
> proceedings will result in a final order of removal.

*Singh,* 2019 WL 3943960, at *5.

**(1) Length of Detention.**  In total, Maldonado has been detained pursuant to the

September 2021 reinstated order of removal for roughly 20 months—or over 600

days—interrupted only by a period of deportation while Maldonado's petition for review

was pending before the Tenth Circuit.  Courts have found that the first *Singh* factor

weighs in the petitioner's favor based on similar durations of detention.  *Cf., e.g.,*

*Martinez,* 760 F. Supp. 3d at 1194 (21 months, or 640 days); *Singh,* 2019 WL 3943960,

at *5 (20 months).  Moreover, even if the Court were to only consider the period of time

that Maldonado has been consecutively detained—roughly eight months—it would still

be sufficient to trigger scrutiny.  The pertinent consideration is whether "[t]he length of

detention has surpassed the rough six-month threshold at which detentions become

less and less reasonable."  *Perez v. Decker,* 2018 WL 3991497, at *5 (S.D.N.Y. Aug.

20, 2018).  That is the case here.  The first factor weighs in Maldonado's favor.

**(2) Likely Duration of Future Detention.**  The second factor requires the Court

---

[3] Judge Rodriguez's decision in *Ramirez* is currently pending before the Tenth Circuit.
*Munoz Ramirez v. Bondi, et al,* Case No. 25-1263 (10th Cir. July 8, 2025).

to "examine the 'anticipated duration of all removal proceedings'—including administrative and judicial appeals—when estimating how long detention will fast." *Villaescusa-Rios,* 2021 WL 269766, at *3 (quoting *Jamal A. v. Whitaker,* 358 F. Supp. 853, 859 (D. Minn. 2019) (internal citation omitted)).  It is virtually certain that, absent judicial relief, Maldonado's "detention will continue both during the pendency [of] DHS's appeal before the BIA and throughout the course of a judicial appeal by either side." *Villaescusa-Rios,* 2021 WL 269766, at *3.  Thus, while "his detention will definitely terminate at some point, . . . that point is likely to be many months or even years from now." *Id.* (quoting *Singh,* 2019 WL 3943960, at *6).  The second factor weighs in Maldonado's favor.

    **(3) Conditions of Detention.**  The third factor requires the Court to "consider whether 'the facility for the civil immigration detention is meaningfully different from a penal institution for criminal detention.'" *Villaescusa-Rios,* 2021 WL 269766, at *4 (internal citation omitted).  "The more that the conditions under which the alien is being held resemble penal confinement, the stronger his argument that he is entitled to a bond hearing." *Id.*

    The Court has little trouble concluding, based on Maldonado's testimony at the evidentiary hearing, that the conditions at the Aurora Facility strongly resemble penal confinement.  More than that, they are abhorrent.  That is, they more than resemble penal confinement.  He credibly testified as follows:

- 80 people live together in a 750-square foot space.  There is little room for exercise.  (Tr. 26:21–15.)

- The Facility's air conditioning frequently fails and, when it does, ICE officers refuse to open the doors despite rising temperatures.  (Tr. 28:13–25.)

- Detainees are only permitted to visit with family members "behind glass and by a telephone"; "[t]here is no physical contact."  (Tr. 29:21–25.)

- Access to medical care and mental health services is limited.  (Tr. 30:1– 32:8.)  The only medication ICE will furnish is Ibuprofen.  (Tr. 31:1–9.)  Despite his mental health diagnoses, Maldonado has seen a psychologist only once, in 2021.  (Tr. 31:21–32:2.)  That psychologist asked him three questions: "if I wanted to kill myself, how I was feeling, and that I needed to be sleeping the majority of the time."  (*Id.*)

- The August 1 evidentiary hearing marked the first time that Maldonado had stepped outside of the Facility since ICE took custody of him in December 2024, nearly eight months prior.  (Tr. 27:16–28:2.)

Notably, Respondents asked only seven questions of Maldonado on cross-examination—none of which challenged his account of the conditions at the Aurora Facility.  (*See* Tr. 42.)  *Cf. Martinez,* 760 F. Supp. 3d at 1195 ("Mr. Martinez's allegations regarding his confinement at the Aurora Detention Facility, which respondents do not contest, demonstrate that he is being held in conditions resembling penal confinement."); *de Zarate,* 2023 WL 2574370, at *4 (where Respondents contended that "[c]ourts have concluded that the detention facility where [petitioner] is detained is enough like a corrections facility for this factor to favor detainees"); *Daley,* 2023 WL 2336052, at *4 (detailing petitioner's account of "the numerous ways that detention in the Aurora facility is more akin to incarceration than a civil confinement" and noting "Respondents do not dispute that these are the conditions under which Petitioner is detained").

The third factor weighs overwhelmingly in Maldonado's favor.

**(4) Delays Caused by Petitioner.**  Relying on Fourth Circuit precedent, Respondents contend that, "[i]n the § 1231(a)(5) context, a noncitizen 'finds himself in continued detention . . . because he voluntarily initiated withholding-only proceedings, blocking his prompt removal from the United States.'"  (ECF No. 24 at 16 (quoting

*Castaneda v. Perry,* 95 F.4th 750, 761 (4th Cir. 2024)).)  Even so, courts have refused

to "hold [petitioners'] efforts to seek relief through the available legal channels against

[them]."  *de Zarate,* 2023 WL 2574370, at *4; *see also German Santos v. Warden Pike*

*County Correctional Facility,* 965 F.3d 203, 212 (3d Cir. 2020) ("we will not hold

[petitioner's] appeals and applications for discretionary relief against him either").  The

Court is particularly disinclined to do so here, where Maldonado ultimately *prevailed* on

his petition for review to the Tenth Circuit.  And beyond the sheer fact that Maldonado

sought withholding-only relief at all, Respondents have failed to identify any other

reason they believe that Maldonado has unduly delayed the proceedings, nor any

dilatory tactics he has purportedly employed.  This factor weighs in Maldonado's favor.

**(5) Delays Caused by the Government.**  On the other hand, Maldonado

contends that the Government has needlessly prolonged the removal proceedings

because it "committed egregious error in his initial withholding-only proceedings, so

much so that the Tenth Circuit found that the agency's decision 'defies logic and law.'"

(ECF No. 27 at 7 (quoting *Arostegui-Maldonado,* 75 F.4th at 1146).)  And thereafter,

Maldonado adds, it was "DHS who chose to appeal when an IJ granted [withholding-

only] relief [as] to both Costa Rica and El Salvador on remand."  (ECF No. 27 at 7.)

Ordinarily, "[a]bsent carelessness or bad faith, [courts] will not scrutinize the

merits of immigration proceedings and blame which party has the weaker hand."

*German Santos,* 965 F.3d at 212.  However, courts have found that unnecessary delay

attributable to an IJ is the sort of "careless or bad-faith mishap[] that we hold against the

Government."  *Id.* at 212 (citing prior decision where the Third Circuit found

"unnecessary delay based on . . . the immigration judge repeatedly issued decisions

that were so unclear that they required remands for clarification").  Similarly, the Court

would not usually hold the Government's appeal against it.  *See Martinez,* 760 F. Supp.

3d at 1195 ("the Court will not hold the fact that respondents appealed . . . in

considering any delay in the immigration proceedings given that [petitioner] does not

argue that the appeal was made in bad faith or as a dilatory tactic").  But the Court

understands Maldonado to argue here that the Government's appeal of the IJ's decision

on remand *was* made in bad faith or as a dilatory tactic, at least because the Tenth

Circuit's decision should have alerted the Government that the appeal was likely

meritless.

> These are troubling questions.  Ultimately, however, the Court need not resolve

whether the IJ's erroneous analysis of the merits of Maldonado's claim or the

Government's appeal of the IJ's decision on remand were done in bad faith.  The fifth

factor either weighs in favor of Maldonado, or it is neutral.  In either case, it does not

change the Court's ultimate conclusion.  Thus, for the purposes of this Order, the Court

will assume it neutral.

> **(6) Likelihood of Removal.**  The final *Singh* factor requires the Court to consider

"the likelihood that the removal proceedings will result in a final order of removal."

*Singh,* 2019 WL 3943960, at *5.  However, in their recent decisions applying the *Singh*

factors to a petitioner detained under § 1231(a)(6), Judge Sweeney and Judge

Rodriguez articulated the sixth factor slightly differently, instead "consider[ing] the

likelihood that removal proceedings will result in [petitioner's] removal."  *Juarez,* 2024

WL 1012912, at *7; *Ramirez,* 2025 WL 1294919, at *7 (same).

> Maldonado contends that his "ultimate removal from the United States is unlikely"

in view of the favorable decisions that have already been issued by the Tenth Circuit and the IJ on remand.  (ECF No. 5 at 22.)  Respondents counter, however, that the sixth factor weighs in their favor because "a final removal order already exists . . . [a]nd, even if the IJ's grant of withholding-only relief is affirmed, Petitioner still may be removed at any time to another country."  (ECF No. 24 at 16.)

When faced with identical arguments from Respondents, Judge Rodriguez nonetheless concluded the sixth factor weighed "slightly in Petitioner's favor," including because there was "a dissent in [the petitioner's] BIA appeal, wherein the dissenting Board member noted she would have reversed and remanded the IJ's decision, supporting that her claim has at least some merit."  *Ramirez,* 2025 WL 1294919, at *7*; see also Juarez,* 2024 WL 1012912, at *7 (finding the sixth factor weighed in petitioner's favor where her "most recent BIA appeal concluded in her favor, with the BIA directing the IJ on remand to engage with the strong country conditions evidence noted above").

The Court agrees with Maldonado that similar indicia that he has a meritorious claim for withholding-only relief exists here.  Thus, the Court concludes that this factor weighs at least slightly in Maldonado's favor.

In sum, at least five of six factors weigh, to some degree, in Maldonado's favor. This is a strong showing of Maldonado's likelihood of success on the merits sufficient to justify even a mandatory injunction.  The Court will therefore assess the remaining preliminary injunction factors to decide whether Maldonado's alternative request for relief should be granted.

2.    Irreparable Harm

"The second preliminary-injunction factor asks whether irreparable injury will befall the movants without an injunction."  *Free the Nipple—Fort Collins,* 916 F.3d at

19

805. "A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite,* 269 F.3d at 1156.

Maldonado contends that he "suffers great, immediate, and irreparable harm each day that he remains detained"—which will continue absent preliminary injunctive relief—for two independent reasons. (ECF No. 5 at 9–15.) First, he asserts that the violation of his Fifth Amendment rights is itself an irreparable injury. (*Id*. at 9.) Second, Maldonado argues that he faces irreparable physical and mental harm due to his continued detention, including harm that is both general to all persons in immigration detention and himself, specifically. (*Id*. at 10–15.) The Court agrees that the first reason is alone sufficient to establish irreparable harm, and it thus does not proceed to analyze the second.

Federal courts have long recognized that the infringement of a constitutional right is an irreparable injury. *See Elrod v. Burns,* 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury."); *Free the Nipple—Fort Collins,* 916 F.3d at 805 ("Most courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury."); *Awad v. Ziriax,* 670 F.3d 1111, 1131 (10th Cir. 2012) ("[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary" (citation omitted; alteration in original)). Here, the Court has concluded that Maldonado has made a strong showing on the merits of his claim that his prolonged detention without a constitutionally adequate bond hearing violates his procedural due process rights. Absent an injunction, this infringement upon his Fifth

Amendment rights will continue.  Thus, the second preliminary injunction factor is satisfied.

    3.    <u>Balance of Equities and the Public Interest</u>

As noted above, the balance of equities and the public interest factors "merge" when the Government is the party opposing the injunction.  *Nken v. Holder,* 556 U.S. 418, 435 (2009).

Respondents argue that "[t]he Supreme Court has recognized that the public interest in the enforcement of the United States' immigration laws is significant."  (ECF No. 24 at 18 (citing *Nken,* 556 U.S. at 436 (where the Supreme Court acknowledged the tension between the "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm," and the "public interest in prompt execution of removal orders")).)  And here, Respondents continue, they have a valid statutory basis under United States immigration laws for Maldonado's continued detention during removal proceedings, which is "a constitutionally valid aspect of the deportation process."  (*Id.* (quoting *Demore v. Kim,* 538 U.S. 510, 523 (2003)).)

True, there may be a generalized public interest in the enforcement of the country's immigration laws.  But that cannot mean that Respondents enjoy an unfettered right to detain noncitizens in contravention with their Fifth Amendment rights. *See Demore,* 538 U.S. at 523 ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." (internal quotation marks omitted)).  To the contrary, where "a constitutional right hangs in the balance," that right "usually trumps any harm to the defendant."  (ECF No. 5 at 22 (quoting *Free the Nipple—Fort Collins,* 916 F.3d at 806).)  Here, the harm to Respondents is quite limited

"because the administrative burden of a bond hearing is minimal . . . ." *Pham v. Becerra,* 2023 WL 27443397, at *7 (N.D. Cal. Mar. 31, 2023).  Compare that mere "administrative burden" to the sizeable harm posed to Maldonado by continued—and potentially unnecessary—detention.  *See id.* ("the imposition of a TRO serves the public interest because it could prevent the 'unnecessary detention' of [petitioner], should an IJ determine that he is 'neither dangerous nor enough of a flight risk to require detention without bond'" (citation omitted)); *Xuyue Zhang v. Barr,* 612 F. Supp. 3d 1005, 1017 (C.D. Cal. Mar. 27, 2020) ("the public interest benefits from a preliminary injunction that expedites a bond hearing to ensure that no individual is detained in violation of the Due Process Clause").  This is particularly so given the patently harsh conditions Maldonado continues to be subjected to, as outlined above.

For these reasons, the Court finds that the balance of equities and public interest factors favor a preliminary injunction in Maldonado's alternative request for relief.  That is, Maldonado is entitled to a constitutionally adequate bond hearing before the IJ.

    4.    Procedures for Bond Hearing

Given this conclusion, the Court considers, as a final matter, the procedures and evidentiary standards that should apply at the hearing.

Maldonado contends that Respondents should bear the burden to show by clear and convincing evidence that he is dangerous or a flight risk.  (ECF No. 27 at 9.) Respondents, for their part, argued at the evidentiary hearing that, should the Court find an injunction affording Maldonado a constitutionally adequate bond hearing is appropriate, it should not impose any conditions for the bond hearing and instead "leave it to . . . the [IJ] to determine what the appropriate procedures are for a bond hearing." (Tr. 107:24–108:8.)

As a general matter, the Supreme Court has long held that the clear and convincing evidence standard applies to civil detention where an individual's liberty interest is at stake. *See, e.g., United States v. Salerno,* 481 U.S. 739, 751 (1987) (noting that pretrial detention is permitted "[w]hen the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community"). The Court sees no compelling reason why a lesser standard should apply in this context. *See Addington v. Texas,* 441 U.S. 418, 425 (1983) ("This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection"); *see also id.* at 432 (in ultimately concluding the "clear, unequivocal and convincing evidence" standard should govern the decision to involuntary commit someone, noting the Court's earlier decisions adopting that evidentiary standard in cases "dealing with deportation" and "denaturalization" (internal citations omitted)). Other judges in this District have reached the same conclusion. *See Juarez,* 2024 WL 1012912, at *8 (noting that, because petitioner's "entitlement to a bond hearing in this case emanates from the Due Process Clause, not from the post-removal detention statute . . . the Court is persuaded that placing the burden of proof on the government comports with due process requirements") (collecting cases); *Ramirez,* 2025 WL 1294919, at *7 (same).

On a separate note, the Court seizes the opportunity to reiterate that "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976) (internal citation and quotation marks omitted). Respondents' conduct thus far leaves the Court with grave doubts regarding their intent to honor this fundamental

requirement.  In particular, it has not escaped the Court's attention that Respondents

hastily conducted a post-order custody review of Maldonado's continued detention on

the same day it was ordered to file a response to the Motion, without providing any

advance notice of the hearing to Maldonado's counsel.  Even more troubling,

Maldonado himself testified that he "received a letter saying to submit proof [in support

of] being released with supervisions, but [he] wasn't able to" because they gave him the

letter "the same day that the proof was due."  (Tr. 32:22–33:2.)

Moreover, although Officer Quinones submitted a declaration attesting to the fact

that ICE conducted this post-order custody review (ECF No. 24-1 at ¶ 32), she

disclaimed any decision-making authority over "which individuals should remain in ICE

custody" during the evidentiary hearing (Tr. 63:2–4.)  Not only that, but it was readily

apparent that she lacked knowledge of even the most basic facts that should have been

directly relevant to Maldonado's custody review allegedly conducted less than a week

prior.  For instance, her declaration states that "ICE determined that Petitioner is a

public safety concern given his criminal history in El Salvador" (*id.*), but when

questioned whether she believed Maldonado would be a danger to the community if

released, she answered that she "would have to review my databases and make that

determination for myself" (Tr. 77:19–21).  Similarly, her declaration states "that

Petitioner is a flight risk because he has been removed from the United States three

times" (ECF No. 24-1 at ¶ 32), but when asked whether she believed Maldonado would

be a flight risk if released, her response was the same: "I would have to review . . . the

databases and review his file again" (Tr. 77:22–24).  Thus, it remains unclear to the

Court who conducted this post-order custody review.  If it was in fact Officer Quinones,

it could not have been a meaningful one given her obvious lack of familiarity with Maldonado.  Then again, Officer Quinones virtually confirmed the outcome of the custody review was preordained in any event.  (Tr. 83:19–24 (Q: "Are you aware of a policy of the Government that no paroles be granted?" / A: "Yes, sir." / Q: "What's the policy?" / A: "As of right now, we were told that we would not be granted paroles.").)

To be clear, the Court does not, at this time, affirmatively impose any further requirements for the bond hearing beyond the evidentiary standard it has concluded is appropriate above.  It will otherwise be up to the IJ to implement procedures for the hearing that comport with due process.  This Court, however, will take a keenly dim view of any further efforts by Respondents to prevent Maldonado from meaningfully participating in his own bond hearing, to include a purposeful opportunity for him to participate in the preparation for said hearing with his counsel.

In sum, the Motion is granted as to Maldonado's request for a preliminary injunction compelling Respondents to afford him an individualized bond hearing before an IJ.  At the bond hearing, Respondents will bear the burden to show by clear and convincing evidence that continued detention is justified.  Although the Court acknowledges that Maldonado asked for the bond hearing to take place within 7 days, in its discretion, the Court orders that the bond hearing must take place within 14 days of this Order.

## C.    Transfer or Removal

The Court next considers Maldonado's request for a preliminary injunction prohibiting Respondents from unlawfully removing him from the United States or transferring him to a facility outside of the District of Colorado.  Here, the parties' dispute primarily centers on whether the Court has authority to enter such an injunction.

Maldonado contends that the Court's authority to enter the injunctive relief at issue derives from two sources: (1) the All Writs Act, 28 U.S.C. § 1651, and (2) its habeas authority under 28 U.S.C. § 2241.  (ECF No. 31 at 3–4.)  Respondents counter that the injunction Maldonado seeks is outside the scope of traditional habeas relief and, in any case, that the INA divests the Court of jurisdiction to enter the injunction.  (*See generally* ECF No. 26.)

Ultimately, the Court finds that it has authority to enter an injunction preventing Maldonado's unlawful removal from the United States and transfer from the District of Colorado during the pendency of these habeas proceedings under at least the All Writs Act.  It thus does not proceed to analyze the scope of its authority to enter the same injunction under § 2241.  Moreover, as courts often do when invoking their authority to enter injunctive relief under the All Writs Act, the Court will forego the traditional four-factor preliminary injunction analysis.  *See, e.g., United States v. New York Tel. Co.,* 434 U.S. 159, 174 (1977) (affirming grant of injunction under the All Writs Act without regard to traditional four factors).  Nevertheless, it finds it prudent to separately discuss its authority to enjoin Respondents from (1) unlawfully removing Maldonado from the United States and (2) transferring him to a facility outside of the District of Colorado.  In so doing, the Court also considers the irreparable harm that is likely to result to Maldonado in the absence of a preliminary injunction.

    1.    <u>Unlawful Removal</u>

Under the All Writs Act, "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. 1651(a). The Supreme Court "consistently has construed the All Writs Act to authorize a federal

court to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in the exercise of jurisdiction otherwise obtained." *Pennsylvania Bureau of Corrections v. U.S. Marshals Serv.,* 474 U.S. 34, 40 (1985) (internal citation and quotation marks omitted).  Thus, the "Act empowers federal courts to fashion extraordinary remedies when the need arises," although "it does not authorize them to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate." *Id.* at 43.

To the Court's mind, there is little question that it has authority under the All Writs Act to enjoin Maldonado's unlawful removal from the United States while these habeas proceedings remain pending.  The Government has argued in other pending litigation that the Court lacks jurisdiction over "already-removed" noncitizen plaintiffs. *D.V.D. v. U.S. Dep't of Homeland Sec.*, 2025 WL 1142968, at *23 (D. Mass. Apr. 18, 2025) (acknowledging DHS's argument "that this Court has no jurisdiction over already-removed aliens").  Accordingly, it appears well within this Court's authority to issue an injunction preventing Maldonado's removal to preserve its jurisdiction over the Petition while it remains pending.  Indeed, invoking its authority under the All Writs Act, the Supreme Court recently did just that. *See A.A.R.P. v. Trump,* 605 U.S. ----, 145 S. Ct. 1364, 1369 (2025) ("We had the power to issue injunctive relief [prohibiting removal] to prevent irreparable harm to the applicants and to preserve our jurisdiction over the matter.  28 U.S.C. § 1651(a).").

Still, Respondents argue that the Court lacks authority to enjoin Maldonado's removal from the United States for the additional reason that "the INA disallows district courts from reviewing DHS's execution of a removal order."  (ECF No. 26 at 10.)

Specifically, Respondents contend that § 1252(g) "strips the jurisdiction of federal courts 'to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to [commence proceedings, adjudicate cases, or] execute removal orders against any alien under this chapter," except as the statute otherwise provides.  (*Id.* at 11 (quoting 8 U.S.C. § 1252(g)).)

However, the Supreme Court has held that § 1252(g) "applies only to three discrete actions that the Attorney General that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'"  *Reno v. Am.-Arab Anti-Discrimination Comm.,* 525 U.S. 471, 482 (1999).  In other words, § 1252(g) does not refer to "all claims arising from deportation proceedings."  *Id.*  And here, Maldonado does not ask the Court to review the underlying merits of the removal decision.  Nor does he ask the Court for a blanket stay of removal.  Rather, he asks that "he not be *unlawfully* removed without adequate notice and due process."  (ECF No. 31 at 6 (emphasis added).)  "[A]s recently discussed by the district court in *D.V.D.,* an alien must be given notice prior to removal to a third country and an opportunity to seek withholding of removal to that country under 8 U.S.C. § 1231(b)(3) and the [CAT]."  *E.D.Q.C. v. Warden, Stewart Detention Center,* 2025 WL 1575609, at *3 (M.D. Ga. June 3, 2025) (citing *D.V.D.,* 2025 WL 1142968, at *19–22.  Accordingly, even assuming Respondents are correct that § 1252(g) would prevent the Court from enjoining Maldonado's removal full stop, it does not preclude it from fashioning the narrow relief that Maldonado seeks here: an injunction requiring Respondents to adhere to their *non-discretionary* obligation to provide Maldonado with notice and an opportunity to seek withholding of removal before he is deported to any

third country.

Further contrary to Respondents' argument, the Court finds that Maldonado's fear of unlawful removal is not merely theoretical nor remote. *See Heideman v. S. Salt Lake City,* 348 F.3d 1182, 1189 (10th Cir. 2003) ("To constitute irreparable harm, an injury must be certain, great, actual, and not theoretical . . . [T]he party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." (internal citation and quotation marks omitted)). For instance, counsel for Respondents asserted at the evidentiary hearing that the automatic stay of execution of the IJ's decision granting withholding-only relief to Costa Rica and El Salvador prevents only Maldonado's removal to those countries while the parties' appeals are pending before the BIA—not beyond. (Tr. 96:3–7 ("I think at this point he could not be removed to those countries. Beyond that, . . . I think under the regulation and under statute, he could be removed to a third country.").) Although counsel noted his "understanding at this point is it is not ICE's practice to do that with someone in Mr. Maldonado's position," he was unable to "give any assurance to this Court or the petitioner of that." (*Id.* at 9–11.)

Moreover, while Officer Quinones testified that ICE was not intending to remove Maldonado from the United States on July 18 (Tr. 67:18–20), her testimony gives the Court little assurance of ICE's plans considering she disclaimed all knowledge of how such decisions are made. Consider, for example, the following exchange:

> Q: Now, in your direct exam, you were asked questions about what sort of decisions you made with regard to detainees. Whether they should be transferred, where they're transferred, the reasons they're transferred. [Who]

makes those decisions?

A: I do not know, sir.

Q: You don't make them, but somebody else does.

A: Yes, sir.

Q: And you don't know anybody—you don't know the names of anybody that makes those decisions?

A: No, sir.

(Tr. 76:10–77:5.)  The Court is also troubled by Maldonado's testimony explaining that "with so many deportations going on, the phones are turned off. . . [until] about 5:00 or 6:00 in the afternoon, maybe sometimes 4:00, . . . three or four times a week."  (Tr. 29:7–13.)  This suggests to the Court that there is a real risk that ICE will initiate efforts to remove Maldonado while severing his ability to seek counsel before he is deported. Maldonado's counsel powerfully expressed the same concern during the evidentiary hearing.  (Tr. 92:21–93:22 (A: "I am terrified that [Maldonado] will be removed unlawfully like [Kilmar Abrego Garcia]." . . . Q: "So, effectively what you're telling me is that you have a concern that under this administration, the DHS and ICE will not follow the rule of law?" / A: "That is exactly what I'm saying.").)

Accordingly, pursuant to its authority under the All Writs Act, the Court will enter an injunction preventing Maldonado's unlawful removal from the United States while these proceedings remain pending.

2.    Transfer from the District of Colorado

Whether the All Writs Act provides the Court with authority to enjoin Maldonado's transfer *within* the United States presents a closer question.  Nevertheless, the Court is ultimately convinced that it does.

Respondents contend "[t]he Supreme Court has made clear that 'the express terms' of the All Writs Act 'confine' courts 'to issuing process 'in aid of' its existing statutory jurisdiction" but "does not enlarge that jurisdiction."  (ECF No. 26 at 8 (quoting *Clinton v. Goldsmith,* 526 U.S. 529, 534–45 (1999)).)  And here, Respondents continue, the Court would maintain jurisdiction over the Petition even if Maldonado were transferred to a different facility in the United States.

It is true that "jurisdiction attaches on the initial filing for habeas corpus relief' and 'is not destroyed by a transfer of the petitioner.'"  *Serna v. Commandant, USDB-Leavenworth,* 608 F. App'x 713, 714 (10th Cir. 2015) (quoting *Santillanes v. U.S. Parole Comm'n,* 754 F.2d 887, 888 (10th Cir. 1985)).  Thus, Respondents are correct that Maldonado's transfer to another facility within the United States would not deprive it of jurisdiction over the Petition.  Nevertheless, as a Maryland federal court recently observed, "[i]n the immigration context, courts have recently invoked the All Writs Act to preserve their jurisdiction over constitutional challenges to lightning-fast deportations." *Abrego Garcia v. Noem,* 2025 WL 2062203, at *6 (D. Md. July 23, 2025).  These invocations of the All Writs Act have not been limited to injunctions prohibiting a noncitizen's removal from the United States.

Several judges in this District have relied on the All Writs Act in entering injunctive relief similar to that requested here.  *See Batooie v. Ceja,* 2025 WL 1836695, at *2 (D. Colo. July 3, 2025) (restraining respondents from removing petitioner *from the District of Colorado* or the United States where he alleged that he had been detained by ICE "for the presumed purpose of removing him to an undesignated country"); *Vizguerra-Ramirez,* Case No. 1:25-cv-881, ECF No. 11 at *2, 5–6 (D. Colo. Mar. 21,

2025) (entering an injunction prohibiting petitioner's removal *from the District of Colorado* or the United States where the petitioner alleged that, absent an order from the Court, she faced imminent removal to Mexico). Indeed, this Court also relied on its authority under the All Writs Act in entering a TRO prohibiting Maldonado's transfer out of the District of Colorado or removal from the United States. (ECF No. 17.)

Moreover, in *Ozturk v. Trump,* a Vermont federal court recently ordered the return of a noncitizen detainee from Louisiana to Vermont, "pursuant to its inherent equitable power, as well [as] its power under the All Writs Act . . . ." 2025 WL 1145250, at *23 (D. Vt. Apr. 18, 2025). The district court reasoned that the transfer would "facilitate [petitioner's] ability to work with her attorneys, coordinate the appearance of witnesses, and generally present her habeas claims . . . ." *Id.* at *22. On appeal, the Second Circuit affirmed. *Ozturk v. Hyde,* 136 F.4th 382, 394 (2d Cir. 2025).

Similarly here, even if Maldonado's transfer would not deprive the Court of jurisdiction over the Petition, he has identified other irreparable harm that his transfer to another facility would cause. Most significantly, he argues that "[f]orcing him to litigate his case many states away from his lawyers would meaningfully deprive [him] of counsel's 'ability to aid in his representation for the duration of these habeas proceedings.'" (ECF No. 31 at 6 (quoting *Suri v. Trump,* 2025 WL 1310745, at *13 (E.D. Va. May 6, 2025)).) The Court agrees these concerns are meaningful and consequential. *Cf. Ozturk,* 2025 WL 1145250, at *22. Moreover, the Court further finds that, given it has just ordered that a bond hearing should take place within 14 days of this Order, Maldonado's transfer in the interim would significantly frustrate his counsel's ability to prepare for and assist Maldonado in that bond hearing.

Yet again, however, Respondents argue that the Court lacks authority to enter an injunction prohibiting Maldonado's removal because the INA "deprives courts of the authority to review discretionary decisions as to where to detain noncitizens." (ECF No. 26 at 9.) Respondents point to 8 U.S.C. § 1231(g)(1), which provides that "[t]he Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." In addition, Respondents direct the Court to 8 U.S.C. § 1252(a)(2)(B)(ii), providing that "no court shall have jurisdiction to review . . . any . . . decision or action of the Attorney General . . . the authority for which is specified under this subchapter to be in the discretion of the Attorney General."

Respondents argue that in *Van Dinh v. Reno,* the Tenth Circuit interpreted these provisions of the INA to "deprive[] the court of jurisdiction, in a class action lawsuit, to restrain the Attorney General's power to transfer noncitizens to appropriate facilities by granting injunctive relief." (ECF No. 26 at 10 (citing 197 F.3d 427, 433–34 (10th Cir. 1999).) However, the Tenth Circuit's decision in *Van Dinh* also turned on § 1252(f), which provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of Part IV of this subchapter . . . *other than with respect to the application of such provisions to an individual alien* against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f) (emphasis added). Unlike *Van Dinh,* this is not a class action. Accordingly, it is unclear that the Tenth Circuit's reasoning in *Van Dinh* applies in this case with equal force.

Even if it did, the Court agrees with Maldonado that the Supreme Court's subsequent decision in *Kucana v. Holder,* 558 U.S. 233 (2010) calls the Tenth Circuit's reasoning into question. Indeed, the Second Circuit recently relied on *Kucana* in

concluding that § 1252(a)(2)(B)(ii), by operation of § 1231(g), did not foreclose judicial review. *Ozturk,* 136 F.4th at 396; *see also Reyna as next friend of J.F.G. v. Hott,* 921 F.3d 204, 209 (4th Cir. 2019) ("§ 1252(a)(2)(B)(ii) does not strip courts of jurisdiction to review transfer decisions").

Accordingly, the Court concludes that it additionally has authority under the All Writs Act to enter an injunction preventing Maldonado's transfer out of the District of Colorado during the pendency of this habeas action. For all these reasons, Maldonado's request for a preliminary injunction prohibiting his transfer out of the District of Colorado and his unlawful removal from the United States during the pendency of these habeas proceedings is granted.

**D.    Bond Requirement**

Although not addressed in the parties' briefing, at the conclusion of the evidentiary hearing, Respondents posited that, if the Court granted relief, it should require Maldonado to put up appropriate security. (Tr. 107:22–24.)

Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." In the Tenth Circuit, district courts have "wide discretion under Rule 65(c) in determining whether to require security." *Winnebago Tribe of Nebraska v. Stovall,* 341 F.3d 1202, 1206 (10th Cir. 2003). This includes the discretion to "determine a bond is unnecessary to secure a preliminary injunction 'if there is an absence of proof showing a likelihood of harm.'" *Coquina Oil Corp. v. Transwestern Pipeline Co.,* 825 F.2d 1461, 1462 (10th Cir. 1987) (citation omitted).

Here, there is no proof that Respondents are likely to suffer harm if this Order is overturned.  To the contrary, "[b]ecause this preliminary injunction enforces fundamental constitutional rights against the government, the court determines [w]aiving the security requirement best accomplishes the purposes of Rule 65(c)."  *NetChoice, LLC v. Reyes,* 784 F. Supp. 3d 1105, 1132 (D. Utah 2024) (internal citation and quotation marks omitted; alterations original); *Entm't Merchants Ass'n v. Henry,* 2006 WL 2927884, at *4 (W.D. Okla. Oct. 11, 2006) ("the Court has discretion to require only a nominal bond, or no bond at all," where "issues of overriding public concern or important federal rights are involved").  The Court concludes that given the important constitutional rights at issue in this case for Maldonado, no bond will be required.

### IV. CONCLUSION

For all the reasons set forth above, the Court ORDERS as follows:

1.      Petitioner's Construed Motion for Preliminary Injunction (ECF No. 5) is GRANTED IN PART and DENIED IN PART as more fully set forth above;

2.      Respondents are **ORDERED** to bring Maldonado before an IJ for a bond hearing within **14 days of this Order**, at which the Government will bear the burden of proof to show by clear and convincing evidence that his continued detention is legally warranted; and

3.      Pursuant to the Court's authority under the All Writs Act, 28 U.S.C. § 1651(a), Respondents, as well as their officers, directors, agents, employees, successors and assigns, and all other persons in active concert or participation with them, are hereby **ENJOINED** from removing Maldonado from the United States or transferring him outside of the District of Colorado while his Petition for Writ of Habeas

Corpus remains pending before this Court.

Dated this 8th day of August, 2025,

BY THE COURT:

William J. Martinez
Senior United States District Judge